DREW, J.
| We review here a judgment dismissing a medical malpractice action. The litigation was brought by Mrs. Elizabeth Ekendahl (“Elizabeth”), the widow of Mr. Carl Eken-dahl (“Carl”), on behalf of herself and her children.[1] Defendants are Dr. Kevin Murphy and his insurer.
The suit focuses on Dr. Murphy’s medical treatment provided to Carl on January 25, 2005. As of that date, the physician had worked as a family practitioner for 15 years. He was and is board-certified in family practice.
Elizabeth urges that the defendant violated the appropriate standard of care by: (1) not ordering a culture in response to a negative finding of a Quidel Quick Vue InLine Strep A Test (“QST”) as directed by the manufacturer, and (2) administering a Celestone shot for symptomatic relief for a man who presented with a sore throat and whose two children has just been diagnosed with strep.
FACTUAL BACKGROUND
During the last decade of Carl’s life, Dr. Murphy treated him 17 times for minor medical problems, including previous bouts of viral pharyngitis (inflamed tissues lining the pharynx), and other respiratory problems, often occurring during the winter months. Through the years, the doctor had occasionally administered Celestone shots to Carl, without incident. He had never treated Carl for strep.
On his last visit to Dr. Murphy, Carl complained of a sore throat over the previous 86-48 hours as well as a mild headache and chills. The | doctor's notes indicate that Carl reported that his children had been diagnosed with strep throat three to four days earlier.[2]
Dr. Murphy performed a physical examination, finding:
• Carl’s eyes, ears, nose, sinuses, and lungs were normal;
• no nasal congestion and no postnasal drip were noted;
• Carl exhibited mild erythema (redness) in the tonsillar and posterior pharyngeal region, but without exudate (pus-like material);
• his temperature was normal, and no history of fever was reported;[3]
*463 • other vital signs were normal;
• no skin rashes were observed; and
• he had ulcerations in the posterior pharyngeal region and positive anterior cervical nodes.
Dr. Murphy ordered the QST. The test results were negative. Dr. Murphy further testified that:[4]
• he did not order a culture,[5] contrary to the manufacturer’s recommendation to do so when getting a negative reading from a QST;
• Celestone does suppress the immune system;
Is* had a culture been taken, it would have been sent to a lab in Alabama, resulting in a delay of two or three days in receiving the culture results;
• Carl’s tonsils had previously been removed, which is a factor militating against a diagnosis of strep; and
• an odor associated with strep, often noticed by clinicians, was not present.
The physician made a diagnosis of acute viral pharyngitis.[6] Dr. Murphy administered 2 ccs of Celestone for symptomatic relief, prescribing rest and fluids, along with Tylenol or Advil. Carl was told to return if he had any problems or changes in his condition. After that office visit on Tuesday, January 25, 2005, Dr. Murphy had no more contact with Carl.
Elizabeth testified that her husband felt a little better the next day but for the rest of the week he was not “back to normal.” By Friday, January 28, Carl told her that he was not feeling well and that if he was not better by Monday he was going to contact an ENT.
Carl was a talented musician and attorney. On Saturday afternoon, January 29, he left Bossier City to fulfill a prior commitment to play music in DeRidder. After the engagement, he was too sick to make the drive home with his band. He spent the night in DeRidder, where Elizabeth picked him up the next day, Sunday, January 30. She drove him to Willis-Knighton Bossier, where he was admitted on an emergency basis. After 22 days of horrific suffering, he died on February 21, 2005.[7] At his death, Carl was 41 Lyears of age. He was survived by Elizabeth and two young children.
Elizabeth filed a petition for a Medical Review Panel (“MRP”) on September 1, 2005.
The MRP found that Dr. Murphy met the applicable standard of care, and explained its reasons at length, concluding:
Dr. Murphy was adherent to a good standard of care and did what the competent average family physician would *464 have done. It is unfortunate that Mr. Ekendahl succumbed to Strep bactere-mia but the evidence does not support that Dr. Murphy performed negligently or withheld proper care.
In summary, the panel is of the opinion that Dr. Kevin Murphy did not breach the standard of care in the. treatment of Mr. Carl Ekendahl.
On February 2, 2009, Elizabeth, individually and as tutrix of her two children, filed this lawsuit against Dr. Murphy and his insurer, Louisiana Medical Mutual Insurance Company.
Following a two-day trial on the merits in September 2012, the trial court ruled from the bench, finding that the defendant’s treatment was within the standard of care for treatment of a patient with Carl’s symptoms.
The trial court explicitly found that:
• there was no expert testimony that the failure to do a follow-up culture was below the standard of care;
• even the defense witnesses testified that there was no need to confirm the test with a culture; and
• injecting Carl with Celestone was not. a deviation below the standard of care required of a family practitioner.
In her personal and representative capacities, Elizabeth now appeals the trial court’s judgment on grounds that it is manifestly erroneous.
We affirm.
INEXPERT TESTIMONY
Elizabeth called three experts on her behalf:
1. Douglas Jenkins, M.D., was accepted as an expert in the field of internal medicine, including the equivalent standards of care for family physicians with respect to the treatment of strep and use of corticosteroids.
Dr. Jenkins testified that:
• the standard of care for the diagnosis and treatment of strep is the same for internal medicine practitioners as for family practitioners;
• Dr. Murphy’s January 25, 2005, treatment of Carl was below the standard of care applicable to family practitioners, as to the injection administered;
• it is improper to give an. oral or injecta-ble steroid to a patient who has a noncritical infection;[8]
• he felt that Carl already had strep on January 25;
• he knew of no case where an injection of 2 ccs of Celestone caused the patient to end up with strep sepsis;
• the manufacturer’s warnings foretold what happened to Carl as a result of the Celestone shot: other infections came into existence, symptoms and infections were masked, the infections worsened, the body’s ability to localize the infection was compromised, and circumstances were created which led to a widespread infection;
• Celestone has no curative effect, though it can make someone “feel good”;
• an intramuscular injection of 2 ccs of Celestone is “quite a bit”;
• the rapid component of the injection stays in the body about three to five days;[9] the longer-lasting component remains for seven to ten days, though exactitude with injections is difficult;
*465 • the cortisone has a half-life of 30-50 hours, with progressive 16half-lives;
• the injection created an unreasonable risk of harm to Carl;
• under these facts, Dr. Murphy could have properly used his clinical judgment not to order a strep test, but he should have prescribed antibiotics, and he should not have ordered the injection;
• during his deposition, he had testified that Dr. Murphy did nothing during Carl’s visit that fell below the standard of care except for administrating the Celestone shot;
• use of a QST rather than a strep culture was within the standard of care;[10] and
• his report reviewing Dr. Murphy’s care never stated that the use of a QST without a follow-up culture was below the standard of care.
When asked by the court whether it was a deviation beneath the standard of care to use steroids where there is a suberitieal viral infection, the doctor responded, “There is some clinical judgment there. I believe it is unnecessary. It does not pass the risk-benefit analysis; and therefore, I think that I would demonstrate a conclusion that it is below the standard of care.”
Dr. Jenkins also stated that any time a doctor gives a steroid injection or oral steroids for a suberitieal infection, or to relieve the symptoms of a suberitieal viral infection, it is a deviation beneath the standard of care.
2. Richard Kamm, M.D., who was accepted as an expert in the field of pathology, discussed in generic terms how a QST should be performed. He offered no opinion as to the standard of care for a family practitioner and |7never stated that the defendant improperly performed the test. He noted that the manufacturer of the QST reported a sensitivity of 92% and a specificity of 99%.
3. Raymond Coghlan, M.D., who was accepted as an expert in the field of internal medicine and infectious diseases, testified that:
• he was Carl’s treating physician at Willis-Knighton Bossier;
• he was not sure whether Carl had strep on Tuesday, January 25, 2005;
• children in the home having strep is a significant factor to consider;
• he personally relies upon strep cultures, as opposed to the QST;
• a culture is the gold standard for Strep A, with accuracy close to 100%;
• a physician who performs a QST, however, is within the standard of care;
• results from a strep culture usually take 24 to 48 hours;
• many primary care physicians use Cele-stone for various illnesses including suspected viral pharyngitis;
• the Infectious Disease Society of America (“IDSA”), the major and most authoritative organization for infectious disease physicians, issued guidelines in 2002 approving usage of the QST for adult patients;
• the IDSA guidelines also approve using or not using a culture for adults, if the QST is negative;
*466 • had he been treating Carl, he may have cultured him;
• based on Dr. Murphy’s findings, he would not have placed Carl on antibiotics;
• exudate is normally associated with strep, and strep patients usually have elevated temperatures;
• ulcers are usually associated with viral diseases;
• strep is usually involved with children, not adults;
|s* after the negative result of the QST, he would have followed the manufacturer’s recommendation and performed a confirming culture;
• 2 ccs of Celestone was a “small” dose considering this patient’s size, and this dosage would not affect the immune system very much;
• even though Celestone’s effect on an immune system is transient, he still prefers not altering an immune system, since strep is so aggressive;
• he had never seen a patient develop strep sepsis from one Celestone shot;
• there is no causal relationship between this dosage and the strep sepsis;
• he analogized strep to a battle within the body, noting that a steroid (Celestone) temporarily holds up the immune system’s attack on the invading strep, which can give strep an advantage; and
• Dr. Murphy’s assessment that Carl had acute viral pharyngitis was within the standard of care.
Dr. Kevin Murphy, M.D., the defendant, was qualified and accepted as an expert in the field of family practice. His testimony has been outlined above.
Dr. Murphy called two experts to testify in court, and entered into a stipulation as to the testimony of another.
1. Thomas E. Kinstrey, M.D., a member of the MRP, was accepted as an expert in the field of family practice. He testified that:
• he had been a family practitioner for over 30 years;
• untreated strep can result in throat abscesses or rheumatic fever, though rheumatic fever is much more likely in children;
• he found the QST to be excellent, accurate, and reliable;[11]
|n* it is much faster and less expensive than a strep culture;
• the national guidelines for primary care physicians recommend usage of the QST in adults, and do not require a culture upon a negative QST;
• he used Celestone shots for his patients for a multitude of problems and frequently used Cortisone for comfort and symptom relief in pharyngitis;
• “almost all” primary care practitioners use Celestone the same way, as well as for numerous purposes not specifically listed by the manufacturer;
• he had never seen or read that a single shot of Celestone would significantly affect someone’s immune system, requiring extended use of corticosteroids, lasting for weeks or months;
• the amount of symptomatic relief medicines offered in this case were innocuous;
• he does not perform a culture for adults in this situation;
• his office does not have an in-house lab;
• getting lab results back usually takes three to five days;
*467 • the manufacturer’s instructions do not supply the standard of care;[12]
• the standard of care is established by national organizations, including associations of the medical profession;[13]
• he pays no attention to the manufacturer’s insert included with Celestone, considering it legalese and overly protective language;
• he acknowledged that the Centor scale[14] recommends a throat culture and antibiotics for patients scoring two (15% risk of strep) or three |in(32% risk of strep) points, and Carl would have scored two points (tender anterior cervical adenopa-thy and no cough);
• he pointed out that more recent studies and learned treatises[15] in 2004 and since do not recommend throat cultures at the primary care level; and
• Dr. Murphy’s actions exemplified the appropriate standard of care.
2. A stipulation was entered that W. Phillip Kinnebrew, M.D. (also a member of the MRP), would have testified, if called, in conformity with Dr. Kinstrey.
3. Adrian M. Casillas, M.D., who was accepted as an expert in the fields of internal medicine, asthma, clinical immunology, and allergy, testified that:
• the Celestone shot administered to Carl was within the standard of care expected of a family practitioner;
• the one shot did not lead to his strep sepsis;
• ordering either a QST or a culture is within the requisite standard of care;[16]
• he has used both the QST and strep cultures;
• the two tests are comparable and within the same range of reliability;
• the QST at the hospital was positive for strep; the culture was negative;
• since 2001, the guidelines of the Centers for Disease Control, the American Academy of Family Physicians, and the American Society of Internal Medicine state that throat cultures are not recom-mendedJjjfor the routine primary evaluation of adults with pharyngitis or for confirmation of negative results on QST when the sensitivity of the QST exceeds 80%;[17]
• the guidelines of the IDSA, the major and most authoritative organization for infectious disease physicians, state that either a QST or a strep culture is appropriate for adults, and makes optional the *468 use of a culture for adults if the QST is negative;
• he could not find a' case where this small amount of Celestone weakened the immune system so much that a patient ended up with strep sepsis;
• the manufacturer’s warning about Cele-stone was a general statement that said nothing about duration or amount of corticosteroids administered;
• such warning statements are issued regarding all types of steroids, including over-the-counter topical steroids; and
• Dr. Murphy-was within the standard of care in (1) diagnosing Carl with viral pharyngitis, (2) using the QST, and (3) not following up with a culture.
ANALYSIS
I. ISSUE ONE: Failure to Culture
Elizabeth argues that the trial court was manifestly erroneous in reaching its conclusion that a culture was not required in this case.
Defendants respond that the trial court did not commit manifest error in concluding that Dr. Murphy did not violate the applicable standard of care by using a QST alone rather than following it up with a strep culture.
The QST package insert, provided by the manufacturer, recommends that a negative result be followed with a throat culture. A manufacturer’s warning is evidence, but not conclusive evidence, of a standard of care.
In Terrebonne v. Floyd, 99-0766 (La. App. 1st Cir.5/23/00), 767 So.2d12 758, the court explained that a manufacturer’s specific warning can be sufficient to establish a prima facie showing of negligence.
In Christiana v. Sudderth, 02-1080 (La. App. 5th Cir.2/25/03), 841 So.2d 911, the court stated that a “health-care provider’s deviation from a manufacturer’s warning may be negligence for which expert testimony is not required to establish the applicable standard of care, because such evidence may be sufficient to make a prima facie showing of negligence.”[18]
Dr. Kamm testified that the- rate of sensitivity for the QST is 92%. Dr. Coghlan testified that the sensitivity of a strep culture is 90-95%. Dr. Casillas called the false negative incident rate of the QST and strep cultures “roughly comparable.”
Articles from peer-reviewed medical journals demonstrate that it is within the standard of care to use a QST rather than a throat culture. The articles also discuss the high levels of sensitivity and accuracy of the QSTs.
In its conclusion, the MRP discussed the Centor criteria for diagnosing whether pharyngitis is viral or bacterial strep. They found that if a patient has a score of 2-3, the physician can decide to either do a QST or a throat culture and prescribe antibiotics with a positive result.[19] Dr. Murphy appropriately chose to do a QST and appropriately decided not to use antibiotics. The MRP further found no medical evidence that Carl had strep when evaluated by Dr. Murphy, or that Dr. Murphy ignored any compelling reason to use antibiotics.
| ^Elizabeth introduced an abstract of a 2005 article entitled “Triage Options for Strep Throat” from American Family Physician. The authors of the article, *469 which was based upon a study involving an unspecified number of Canadians, recommended culturing children and adults with a Centor score of 2 or 3. No physician who testified at trial concurred with this approach.[20]
Elizabeth’s argument that the standard of care should be set by the manufacturer of the QST and not by physicians is contrary to well-settled law.[21]
II. ISSUE TWO: The Celestone Shot
Elizabeth’s second issue is that Dr. Murphy’s administration of Celestone to Carl violated the appropriate standard of care, as the physician ignored package insert warnings that the drug has the potential to mask infections, allow other infections to come into existence during its use, decrease resistance, and inhibit the body’s ability to localize an infection. Here, all these events took place.
We certainly understand that physicians cannot create a standard of |14care just because a particular drug is economically to their advantage and their patients “swear by it” and “ask for it.” That is not the situation here. The medical literature, the national associations, and the experts at trial delineated the applicable standard of care. We find that the Celestone injection was not a deviation below that standard of care.
Some of the trial court’s comments could lead to a conclusion that it had preconceived notions about the applicable standard of care, particularly when the court spoke of the testimony of Dr. Jenkins.[22]
The evidence does not support Elizabeth’s argument that the injection ruined Carl’s immune system such that he developed strep sepsis. Apparently the trial court’s decision was guided, in large part, by the almost unanimous conclusions of the medical experts.
III. SUMMARY
Plaintiff called three experts.
• Dr. Kamm gave helpful information about the QST, but very little disposi-tive information about the merits of this case.
• Dr. Jenkins testified that failing to culture was not a deviation below the standard of care, but that giving the Celestone shot[23] was a deviation below the standard of care.
*470 • Dr. Coghlan testified that failing to culture was a deviation below the standard of care, but that giving the Cele-stone shot was not a deviation below the standard of care.
Defendant’s medical expert, Dr. Kin-strey, testified that Dr. Murphy’s 11fitreatment of Carl exemplified the appropriate standard of care.[24]
Dr. Casillas was also called as a medical expert by Dr. Murphy. His testimony was that the administration of the Celestone shot was within the standard of care.
To reverse the trial court’s judgment would require our finding it to be manifestly erroneous, and this we cannot do, as the overwhelming weight of the evidence in this record supports the findings of the trial court.[25]
DECREE
At the cost of plaintiff, the judgment of the trial court, dismissing this lawsuit with prejudice, is AFFIRMED.

. Mr. and Mrs. Ekendahl are referenced herein as Carl and Elizabeth. This is for ease of understanding by the writer, the panel, and the readers of this opinion. It should in no way signify a lack of respect for the Ekendahl family.

. Actually, Carl’s daughter had been diagnosed with strep on Saturday, January 22, 2005. His son was diagnosed with strep on Monday, January 24, the day before Eken-dahl’s last visit to Dr. Murphy. Each diagnosis was rendered by a pediatrician.

.Fever and exudate are often associated with a diagnosis of strep. Ulcers more often relate to viral illness.

. The doctor’s trial testimony differed somewhat from his deposition testimony, as to whether he suspected strep on this last visit, and whether the positive strep tests of Carl’s children influenced his treatment decision. He admitted seldom, if ever, ordering strep cultures.

. Usage of the QST, without a confirming culture, has been endorsed by the Centers for Disease Control, the Infectious Disease Society of America, the American Family Practice Association, the Internal Medicine National Organization, the Medical Review Panel ("MRP”), as well as the testimony of Doctors Coghlan, Kinstrey, and Jenkins. It was stipulated that Dr. W. Phillip Kinnebrew, another member of the MRP, would have testified in conformity with Dr. Kinstrey.

. In adults, pharyngitis is most commonly caused by a virus. In contrast, strep throat, which is caused by bacteria, is more common in children.

. The death certificate provides this information as to cause of death: Multisystem organ failure, due to or as a consequence of toxic shock syndrome, due to or as a consequence of Streptococcal sepsis, due to or as a consequence of Streptococcal pharyngitis.

. Curiously, he testified in his deposition that he gaye oral steroids fairly commonly. He testified that he never gave intramuscular injections of steroids.

. In his deposition, Dr. Jenkins said that the rapid release of the Celestone would occur over a period of one to two days.

. Dr. Jenkins testified that:
• the QST is "a good test,” with a sensitivity of 87%, i.e., if 100 patients presented with strep, the QST would pick up 87 of them;
• the QST has a specificity of over 90%, meaning that 95% or more of its positives are accurate;
• he never uses the QST in his practice and very seldom cultures; but
• if Dr. Murphy used a QST, he should have followed its instructions about using a culture.

. Dr. Kinstrey testified that both the sensitivity and specificity of the QST are upwards of 90%, and he further testified that the QST “encroaches on the actual accuracy of the gold standard, or the throat culture.”

. Dr. Kinstrey testified that the specificity of a QST is 93%, while the specificity of a throat culture 97%. He stated that “there's almost no place for a throat culture in primary care anymore.” He further noted that the hospital records indicate that a QST was run upon admission at the emergency room at Willis-Knighton Bossier, with a positive result. The culture yielded a negative result three days later.

. Examples: Centers for Disease Control, the American Academy of Family Physicians, and the American College of Physicians Society of Internal Medicine.

. The "Centor Scale” was created in 1981 by Dr. R.M. Centor, and it has been used in the medical profession for many years.

. Particularly, a March 15, 2004, article in the American Family Physician, which is the national journal for family practitioners, flatly states: “Rapid Strep antigen tests are easy to perform and results are available within minutes. Because of improvements in the sensitivity of these tests, negative results no longer have to be confirmed by throat culture.”

. Guidelines for numerous national medical organizations endorse this concept. The manufacturer of the QST, however, recommends a confirming culture upon a negative result.

. The consensus in the industry is that the sensitivity of the QST was well over 80%.

. These two cited opinions were rendered in the context of motions for summary judgment. Neither opinion held a trier of fact to be manifestly erroneous in relying on the testimony of medical experts as opposed to a manufacturer's statement.

. Carl’s Centor score was a 2.

. Elizabeth also relied on a Wikipedia article entitled "Centor criteria” as support for her argument that someone scoring a 2 or 3 on the scale (like Carl) required a culture rather than a QST. The authority cited is an article by Dr. R.M. Centor published in 1981. Dr. Casillas testified that he was not sure whether the QST was even available in 1981, and that the initial QSTs did not have the high level of sensitivity as did versions manufactured after 2000.

. "Expert testimony is generally required to establish an applicable standard of care and whether or not that standard was breached, except where negligence is so obvious that a lay person can infer negligence without the guidance of expert testimony.” Roberts v. Marx, 47,658 (La.App. 2d Cir.1/16/13), 109 So.3d 462, writ denied, 2013-0649 (La.4/26/13), 112 So.3d 847. No physician testified that a manufacturer's recommendations can constitute a physician’s standard of care, and Dr. Kinstrey noted that such manufacturer statements are placed for legal reasons so as to not be sued if there is a false negative when a patient actually has the disease.

. Dr. Jenkins testified that giving Celestone whenever an infection was present was below the standard of care. In its ruling, the trial court relied on its life experiences in stating, "I simply don’t believe that.” Nonetheless, the evidence in this record strongly preponderates that the trial court made the right decision.

. Dr. Jenkins also testified at trial that Dr. Murphy should have administered antibiotics. This criticism was not found in his deposition.

. By stipulation, it was agreed that had Dr. Kinnebrew testified, his testimony would have replicated Dr. Kinstrey. Both doctors served on the MRP.

. Our findings on the merits herein obviate the need to focus on the damages here, which far exceed the medical malpractice "cap” of $500,000.00. Carl went through unimaginable pain, suffering, and anguish from January 30, 2005, the date of his hospital admission, until his death 22 days later. Medical expenses alone totaled $829,785.86. He suffered bilateral leg amputations above the knees, an open abdominal wall surgery, and ultimately, necrosis of his organs and internal systems. His brain was simply dissolving, and he mercifully passed away on February 21, 2005, after three agonal weeks. At death, Carl was an attorney earning in excess of $69,000 per year, plus other income as a musician. The testimony of Elizabeth and her children was heartbreaking.
These three analogous cases support Elizabeth’s position that her claim far exceeds the medical malpractice cap: Raymond v. Government Employees Ins. Co., 2009-1327 (La.App. 3d Cir.6/2/10), 40 So.3d 1179, writ denied, 2010-1569 (La. 10/8/10), 46 So.3d 1268; Roberts v. Owens-Corning Fiberglas Corp., 2003-0248 (La.App. 1st Cir.4/2/04), 878 So.2d 631, writ denied, 2004-1834 (La. 12/17/04), 888 So.2d 863; and Wingfield v. State ex rel. Dept. of Transp. & Dev., 2001-2668 (La.App. 1st Cir. 11/8/02), 835 So.2d 785, writs denied, 2003-0313 (La.5/30/03), 845 So.2d 1059, 2003-0339 (La.5/30/03), 845 So.2d 1060, and 2003-0349 (La.5/30/03), 845 So.2d 1060.